```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
                 Civil No. 17-3473(DSD/SER)
```

Lighthouse Management Group, Inc.
as assignee for the benefit of
creditors of AV Development Company
LLLP, Apple Valley Commons II and AV
Commons II LLLP,

      Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　　　　**ORDER**

Deutsche Bank Trust Company
of Americas, MelTel II W3, LLC,
and MelTel II Valentine, LLC,

      Defendants.

    Arthur G. Boylan, Esq. and Anthony Ostlund Baer & Louwagie, PA, 90 South 7th Street, Suite 3600, Minneapolis, MN 55402, counsel for plaintiff.

    Brian W. Varland, Esq. and Heley, Duncan & Melander, PLLP, 8500 Normandale Lake Blvd., Suite 2110, Minneapolis, MN 55437, counsel for defendants.

This matter is before the court upon the motions for judgment on the pleadings or, in the alternative, summary judgment by defendants Deutsche Bank Trust Company Americas; MelTel II W3, LLC; and MelTel II Valentine, LLC (MelTel).[1] Based on a review of the file, record, and proceedings herein, and for the following reasons, the courts denies the motions.

---

[1] MelTel II W3 and MelTel II Valentine were previously named WCP III and Valentine Capital respectively. The court will refer to defendants collectively as MelTel unless a finer distinction is required.

**BACKGROUND**

This property dispute arises out of the allegedly fraudulent assignment of certain property rights to MelTel.

**I. The Parties**

Plaintiff Lighthouse Management Group is an assignee for the benefit of creditors of Apple Valley Commons (AVC)[2] under Minn. Stat. § 577.14. Rev. Am. Compl. ¶ 6; Varland Decl. Ex. C at 3-4. Lighthouse is charged with investigating AVC's business management; using AVC's business assets for the benefit of creditors; if necessary, taking possession of AVC's property to further the creditors' interests; and exercising the powers of a general receiver. See also Minn Stat. § 577.18.

AVC owns two large office buildings in Apple Valley, Minnesota (Buildings).[3] Varland Decl. Ex. A. at 3. Since 1994, AVC has leased roof-top, antennae space at one of the Buildings to wireless phone companies Verizon and T-Mobile in exchange for monthly rent payments (Lease Rights). Id. at 7; Rev. Am. Compl. ¶ 2. During 2014 and 2015, John Hanson was AVC's general partner, chief manager, and a primary investor. Varland Decl. Ex. A at 3; Boylan Supp. Decl., ECF No. 102, Ex. 31 at 6.

---

[2] AVC consists of three entities: AV Development Company LLLP, Apple Valley Commons II LLLP, and AV Commons II LLLP.

[3] The Buildings are located at 15025 Glazier Avenue and 7300 West 147th Street.

MelTel and Deutsche Bank are involved in asset-backed securities. Voon Decl. ¶ 5; Bauermeister Dep. at 25:13-27:5. MelTel issues investor notes and, as collateral, acquires lease rights to wireless phone antennas. Bauermeister Dep. at 28:12-17. MelTel then grants mortgages on those leases to Deutsche Bank, which serves as the indenture trustee for the note-holders. Voon Decl. ¶ 6. In total, MelTel has acquired nearly 1,500 wireless antennae lease rights. Bauermeister Dep. at 29:14-16.

Before MelTel acquires a property interest, it conducts an asset due diligence review to ensure that the entity or individual negotiating the property transfer or assignment with MelTel has the requisite ownership interest over the asset. Hwang Decl. ¶ 3. MelTel investigates all asset ownership through an internal department, see id., and logs its due diligence efforts and communications in a specially designed database. Wade Dep. at 41:19-22. Deutsche Bank relies entirely on MelTel's due diligence review. Id. at 56:4-24; Voon Dep. at 27:23-25.

**II. The Lease Rights Assignment**

MelTel first approached John Hanson in 2007 about acquiring the Lease Rights, but he did not respond. Boylan Decl., ECF No. 65, Ex. 1 at 2-3; see also Boylan Supp. Decl. Ex. 28 at 7. MelTel contacted John Hanson approximately an additional fifteen times over the next several years, but he remained uninterested in assigning the Lease Rights. Boylan Supp. Decl. Ex. 28 at 6-7.

3

Then in June 2014, AVC agreed to sell the Buildings to Hillside, LLC, owned by Chris Hanson (no relation to John Hanson). Varland Decl. Ex. A at 4, 50. John Hanson subsequently informed MelTel that AVC was selling the Buildings, and that he had communicated MelTel's interest in the Lease Rights to Hillside. <u>Id.</u> at 6; <u>see also</u> Boylan Decl. Ex. 1 at 3.

In July 2014, Chris Hanson represented himself to MelTel as the owner and/or landlord of the Buildings and began negotiating directly with MelTel regarding an assignment of the Lease Rights. Boylan Supp. Decl. Ex. 28 at 5. Chris Hanson told MelTel that he was John Hanson's brother, and that he planned to acquire John's interests in the Lease Rights. <u>Id.</u> He also told MelTel that he would consider an offer to assign the Lease Rights in exchange for a cash payment. <u>Id.</u>

On July 22, Chris Hanson accepted MelTel's proposal to acquire the Lease Rights for a 99-year term in exchange for a lump-sum payment. <u>Id.</u> On July 23 and July 29, Chris Hanson again represented to MelTel that he was the Buildings' landlord, <u>see id.</u> Ex. 29 at 2, and granted MelTel an exclusive option to acquire the Lease Rights. <u>Id.</u> Ex. 30 at 1–3. Based on those representations, MelTel assumed that Chris Hanson was the controlling person for the "landlord entity, Hillside." Wade Dep. at 24:11-13.

However, during that same time period, MelTel received information that Chris Hanson and Hillside were not the Buildings'

owner or landlord. On August 8, Chris Hanson told MelTel that he had not yet acquired the deed to the Buildings, but that he hoped to do so in the next few days. Boylan Supp. Decl. Ex. 28 at 4. On August 12, MelTel left Chris Hanson a voicemail asking whether the deed transfer had occurred. Id. at 3. On September 2, MelTel noted that Chris Hanson was still negotiating the Buildings' sale and the "idea [now] is to close [the Lease Rights' assignment] with [the] current fee owner," AVC.[4] Id.

Despite this information, MelTel still identified Chris Hanson as the Buildings' landlord. On September 15, MelTel noted that Chris Hanson, the Buildings' "landlord," had retained counsel, John Berkey, to close the sale of the Buildings. Id. On September 25, MelTel noted that the landlord, Chris Hanson, "would now like to close [the Lease Rights assignment] in the name of Hillside" and that the "closing of the [Buildings] will happen in about 7 days." Id.

However, Chris Hanson did not have the financing to close the Buildings' sale. In early October, Chris Hanson told John Hanson that in order to obtain financing to close the Buildings' sale, he needed to generate cash. Varland Decl. Ex. A at 3. Chris Hanson and Berkey suggested that AVC assign the Lease Rights to MelTel for a lump-sum cash payment, which could be used to facilitate the sale

---

[4] "Noted" refers to notes recorded in MelTel's due diligence database.

of the Building. Id. John Hanson appears to have agreed to the proposal and to that end, on October 8, John Hanson told MelTel that the Lease Rights assignment would be in AVC's name, rather than Hillside's. Id. John Hanson explained to MelTel that Chris Hanson had not yet been able to obtain financing to purchase the Buildings and it was uncertain when he would be able to do so. Boylan Supp. Decl. Ex. 28 at 2.

On November 10, AVC, as the Buildings' "Landlord," and MelTel entered two agreements, both entitled "Purchase and Sale of Lease and Successor Lease Agreement." Id. Exs. 31, 32. The agreements assigned the Lease Rights to MelTel for 99 years (Assignment).[5] Id.; see also Varland Aff. Exs. C, E. John Hanson signed the Assignment on AVC's behalf.[6] Boylan Supp. Decl. Exs. 31, 32. The Assignment expressly stated that MelTel "shall pay to [AVC], in consideration for the rights and interests granted by [AVC] to [MelTel]" the purchase price of $440,000.[7] Id. The Assignment also expressly stated that MelTel would pay AVC a second $35,000

---

[5] The two agreements comprising the Assignment included two separate memorandum.

[6] John Hanson "made it his practice" to sign his name John O. Hanson because John Hanson is a common name. Varland Decl. Ex. A at 3.

[7] The agreements stated that "[u]pon the Effective Date, [MelTel] shall pay to [AVC], in consideration for the rights and interests granted by [AVC], a one-time lump-sum amount ...." Id. The $440,000 payment was divided into two payments of $300,000 and $140,000. Id.

6

payment thirty days after MelTel obtained title insurance on the Lease Rights. Id. The Assignment further provided that AVC had assigned the Lease Rights to MelTel "on the terms and subject to the conditions set forth" therein. Varland Aff. Exs. C, E. MelTel, in turn, took possession of the Assignment and subsequently recorded it with the Dakota County District Court on December 4. Boylan Supp. Decl. Exs. 31, 32; see also Rev. Am. Compl. ¶ 17; Varland Aff. ¶¶ 2-7; Varland Aff. Exs. A-F. Later on November 10, MelTel entered a separate agreement whereby it again agreed to "wire the [Lease Rights] purchase proceeds ... to [AVC] ...." Boylan Supp. Decl. Exs. 33, 34.

Then, on the morning of November 12, MelTel received two landlord settlement statements, purportedly from AVC, with wiring instructions for the $440,000 payment. Id. Exs. 39, 40. The statements identified AVC as the landlord, but instructed MelTel to wire the payment to a Hillside bank account. Id. The statements were not signed by John Hanson.[8] Id.

Later that day, the wiring instructions changed again. MelTel noted that "per John Hanson" it was required to wire the payment to Berkey's client trust account at PNC Bank on Hillside's behalf. Id. Ex. 28 at 1. Consistent with that instruction, MelTel wired $421,734.17 to Berkey's trust account. Boylan Decl. Ex. 11.

---

[8] The signature on the landlord settlement statements are illegible. Lighthouse alleges that Chris Hanson fraudulently signed them on AVC's behalf.

7

MelTel subsequently obtained two mortgages from Deutsche Bank on the Lease Rights.[9] Shortly thereafter, MelTel started collecting the monthly rent proceeds under the Lease Rights. Boylan Decl. Ex. 18.

John Hanson was not aware of the wire transfer to Berkey and AVC did not receive any of the $421,734.17 payment. Varland Decl. Ex. A. at 7. The record does not show whether MelTel tendered the $35,000 payment. MelTel testified that it is not aware of any previous situation in which it paid the lease purchase price to an entity other than the title or property owner or lease landlord. Bauermeister Dep. at 94:25-96:11. Hillside ultimately was unable to secure financing and never purchased the Buildings. Varland Decl. Ex. A at 5.

**III. Lighthouse Appointment and Investigation**

In April 2013, AVC and Husker Management Company (Husker) agreed that Husker would manage the Buildings and the collect rents. Id. at 2. In exchange, Husker received a percentage of the rental income. Id. It appears, however, that Husker did not always remit the rental proceeds as agreed and failed to keep an accounting of the collected rents. Id.

In mid-2015, AVC hired Lighthouse to conduct a third-party audit given its suspicions that Husker was not properly reporting

---

[9] Deutsche Bank also recorded its interests on December 4 with the Dakota County District Court. Varland Aff. Exs. A, B.

the rental income. AVC later agreed to assign its interest in the Buildings' to Lighthouse for the benefit of creditors, and in exchange, Lighthouse would conduct the audit and, if necessary, pursue legal action on AVC's behalf. Lighthouse agreed to reassign the Buildings back to AVC at the conclusion of its investigation and any related legal action.

During the course of the investigation, Lighthouse discovered that Chris Hanson had orchestrated a number of fraudulent real estate transactions involving assignments and other encumbrances on the Buildings. Boylan Decl. Ex. 1 at 5. For example, unrelated to this case, Lighthouse learned that Chris Hanson obtained several large loans through Fidelity Investment Group, LLC, using the Buildings as collateral and by representing himself as AVC's "Managing Member." Id.; see also id. Ex. 4 at 2, 34-36. Lighthouse commenced a number of actions on AVC's behalf to clear adverse property claims. In 2015 and 2016, Lighthouse sued Husker, Chris Hanson, Fidelity, and others in Dakota County District Court. Boylan Decl Ex. 1. at 1; Ex. 6 at 2. These cases either settled or resulted in default judgment. Id. at 1; Id. at Ex. 6 at 2.

**IV. This Lawsuit**

On July 3, 2017, Lighthouse filed suit against Deutsche Bank in Hennepin County District Court and Deutsche Bank timely removed. On January 24, 2018, Lighthouse filed a revised amended complaint raising quiet-title, declaratory judgment, and unjust enrichment

claims.  Defendants now move for judgment on the pleadings or, in the alternative, summary judgment.

## DISCUSSION

I.  **Summary Judgment**[10]

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient ....").

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute

---

[10] Because the court has considered both the initial and supplemental affidavits, exhibits, and memoranda in resolving the instant motions, it will apply the summary judgment standard.

10

exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

### A. Quiet Title

Lighthouse brings a quiet-title claim to determine the parties' adverse property interests in the Lease Rights. Lighthouse, specifically, requests that the court declare that: (1) the Assignment and mortgages are null and void,(2) MelTel and Deutsche Bank do not have an interest in the Lease Rights and,(3) any adverse interests are cleared from the Buildings' title. Rev. Am. Compl. ¶ 33.

Minnesota's quiet-title statute provides that "[a]ny person in possession of real property ... may bring an action against another who claims an estate or interest therein, or a lien thereon, adverse to the person bringing the action, for the purpose of determining such adverse claim and the rights of the parties, respectively." Minn. Stat. § 559.01.

#### 1. Fraud

MelTel first asserts that Lighthouse's quiet-title claim fails as a matter of law because Lighthouse has not alleged that it

11

engaged in fraud.  However, MelTel cites no authority, and the court can find none, stating that the only basis for a quiet-title action is fraud.  Indeed, § 559.01 simply requires that a plaintiff have "possession of real property" and that the defendant be "another who claims an ... interest ... adverse to the person bringing the action" such that the court may determine the rights of the parties.  Minnesota law requires nothing more.

### 2. Surrender of Interest

MelTel next argues that Lighthouse's quiet-title claim fails as a matter of law because AVC surrendered its interest in the Lease Rights through the conveyance of the Assignment on November 10.  Specifically, MelTel argues that once John Hanson signed the Assignment on AVC's behalf and MelTel took possession of the Assignment, the Assignment was legally delivered, and consequently, MelTel became the lawful and indefeasible owner of the Lease Rights.  MelTel further argues that its failure to remit the purchase payment to AVC does not invalidate its property interest because AVC legally conveyed the Assignment when it was signed and MelTel took possession.  According to MelTel, AVC's recourse is limited to recovering damages related to payment.  The court disagrees.

Delivery of a real property interest "is effective if the grantor manifests a clear intention to part presently and unconditionally with all control ...." Mollico v. Mollico, 628

12

N.W.2d 637, 640-41 (Minn. Ct. App. 2001)(internal citations omitted). Delivery is "complete only when the grantor has put it beyond his power to revoke or reclaim." <u>Fenrick v. Olson</u>, 131 N.W.2d 235, 241 (Minn. 1964). "The intent of the parties may be considered in determining when" the real property conveyance occurred. <u>Travelers Ins. Co. v. Horseshoe Lake Farms, Inc.</u>, 456 N.W.2d 453, 458 (Minn. Ct. App. 1990). "With respect to the execution of conveyances ... the grantor must understand the nature and effect of what he is doing, and that equity may require cancellation of an instrument for an entire lack of consideration therefor." <u>Fenrick</u>, 131 N.W.2d at 240. "Where the intent of the parties is totally ascertainable from the [conveyance] writing, construction is for the court." <u>Mollico</u>, 628 N.W.2d at 641 (internal citations omitted).

Here, the record establishes that the Assignment was not delivered as a matter of law. The Assignment plainly states that MelTel's interest in the Lease Rights is subject to certain conditions. There is no dispute that a significant condition, that MelTel tender a $440,000 purchase payment, did not occur. In addition, MelTel failed to pay the second $35,000 payment as was also required under the Assignment. The court cannot conclude that the sale contemplated by the Assignment was fully delivered on November 10, given that MelTel did not pay AVC as required. Under these circumstances, the evidence does not show that AVC intended

13

to presently and unconditionally surrender its interest in the Lease Rights on November 10, when the Assignment was signed. As a result, this argument fails as a matter of law.

### 3. Bona-Fide Purchaser

MelTel lastly argues that Lighthouse's quiet-title claim fails because it is a bona-fide purchaser protected under the Minnesota Recording Act. Minn. Stat. § 507.34; see also Bruggeman v. Jerry's Enter., Inc., 591 N.W.2d 705, 710 (Minn. 1999); Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 524 (Minn. 1990). A bona-fide purchaser is "defined as one who gives consideration in good faith without actual, implied, or constructive notice of inconsistent outstanding rights of others." Anderson v. Graham Inv. Co., 263 N.W.2d 382, 384 (Minn. 1978). Implied notice is based on "actual knowledge of facts which would put one on further" duty to inquire. Id.; see also Claflin v. Commercial State Bank of Two Harbors, 487 N.W.2d 242, 248 (Minn. Ct. App. 1992). Bona-fide purchaser status is an affirmative defense, which MelTel has the burden of proving. Goette v. Howe, 44 N.W.2d 734, 738 (Minn. 1950); see also MidCountry Bank v. Krueger, 782 N.W.2d 238, 244 (Minn. 2010).

The court cannot conclude that the evidence establishes that MelTel is a bona-fide purchaser as a matter of law. Despite Chris Hanson's July 2014 representations that he was the Buildings' owner and/or landlord, MelTel was aware that he was neither by August

2014.  In addition, by September 2014, MelTel had actual notice that Chris Hanson had not secured financing to purchase the Buildings.  In mid-October 2014, MelTel was again on notice that Chris Hanson and Hillside still had not secured financing.  In early November 2014, MelTel agreed several times to make the purchase payment to AVC, and not to Hillside.

    Nevertheless, on November 12, MelTel made the purchase payment to Hillside through Berkey.  Given these facts, a jury could find that MelTel had at least implied notice of AVC's right to the purchase payment.  At a minimum, a jury could conclude that MelTel had a duty to ask why the wiring instructions had changed and why the previous payment agreements were no longer in place.  Indeed, there is no indication in the record that MelTel ever questioned why the wiring instructions changed at the last minute. This is particularly curious given that there is no indication in the record that John Hanson ever told MelTel that the previous payment agreements had been rescinded or modified.  MelTel could have simply contacted John Hanson before wiring the purchase payment to Hillside to verify the conflicting instructions, but it failed to do so.  There are certainly facts that may explain why MelTel chose not to inquire, but they are for the jury to weigh in deciding the issue.  As a result, the court must deny MelTel's motion for

15

summary judgment on the quiet-title claim.[11]

**B.    Declaratory Judgment**

Lighthouse seeks the same relief under the Minnesota Uniform Declaratory Judgment Act as it does in its quiet-title claim. See Minn. Stat. §§ 555.01–555.16.  The Act provides that "[a]ny person ... whose rights, status, or other legal relations are affected by a statute" may obtain a declaration as to those rights, status, or legal relations and as to any question of construction or validity of the statute.  Minn. Stat. § 555.02.  "A declaratory judgment may be entered regardless of whether further relief is or could be claimed, and it will lie when legal relations are affected by a statute, municipal ordinance, contract, or franchise." All. for Metro. Stability v. Metro. Council, 671 N.W.2d 905, 915 (Minn. Ct. App. 2003).

The purpose of the Act is to settle uncertainty, and it is to be liberally construed and administered.  Minn. Stat. § 555.12. "The Act, however, is not an express independent source of jurisdiction." All. for Metro. Stability, 671 N.W.2d at 915. "A party seeking a declaratory judgment must have an independent, underlying cause of action based on a common-law or statutory right."  Id.

---

[11]  A jury may also conclude that Deutsche Bank was under a duty to further inquire, or, conduct its own review. As a result, a jury must decide whether Deutsche Bank is a bona-fide purchaser.

16

Here, because a jury could conclude that MelTel was not a bona-fide purchaser, MelTel has not shown that Lighthouse does not have an independent quiet-title claim. As a result, MelTel's motion as to the declaratory judgment claim must be denied.

**C. Unjust Enrichment**

The parties agree that Lighthouse's unjust enrichment claim is inextricably intertwined with its quiet-title claim – if MelTel is a bona-fide purchaser of the Lease Rights, it cannot be unjustly enriched by its interest in those Lease Rights. Lighthouse argues that MelTel has been unjustly enriched because it did not pay AVC for the Lease Rights and is collecting the proceeds under the Lease Rights. Lighthouse also argues that MelTel's retention of the Lease Rights under these circumstances is morally wrong. MelTel responds that it is entitled to summary judgment on the unjust enrichment claim because Lighthouse has not shown that it acted illegally or unlawfully.

In Minnesota, the elements of an unjust enrichment claim are: "(1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it." Dahl v. R.J. Reynolds Tobacco Co., 742 N.W.2d 186, 196 (Minn. Ct. App. 2007). A plaintiff must show "that [the defendant] was unjustly enriched in the sense that the term unjustly could

17

mean illegally or unlawfully." First Nat'l Bank of St. Paul v. Ramier, 311 N.W.2d 502, 504 (Minn. 1981). This court has held, however, that unjust enrichment claims may be asserted even if the defendant did not participate in an illegal or unlawful activity, so long as it would be morally wrong for the defendant to retain the benefit generated by the failure of consideration, fraud, or mistake. See Hartford Fire Ins. Co. v. Clark, 727 F. Supp. 2d 765, 777-78 (D. Minn. 2010); Kranz v. Koenig, 484 F. Supp. 2d 997, 1001 (D. Minn. 2007); see also Cady v. Bush, 166 N.W.2d 358, 361–62 (1969).

The Minnesota Court of Appeals appears to be split on the issue. Compare Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001)("[T]he cause of action for unjust enrichment has been extended to also apply where, as here, the defendants' conduct in retaining the benefit is morally wrong); Honeywell/Alliant Techsystems Fed. Credit Union v. Buckhalton, No. C2-99-1194, 2000 WL 53875 (Minn. Ct. App. Jan. 25, 2000)("[Despite the absence of proof of fraud or illegal conduct on the part of appellants, because of equity, they are not entitled to the money."), with Diversified Water Diversion, Inc. v. Hogenson Props., Ltd., No. A14-1519, 2015 WL 2185201, at *3-4 (Minn. Ct. App. May 11, 2015)(holding that plaintiff must show that defendant engaged in wrongful conduct in either obtaining or retaining the benefit to support an unjust enrichment claim). The Minnesota

18

Supreme Court has consistently described unjust enrichment claims in terms of the inequitable resulting circumstances and not necessarily on the defendant's wrongful actions. Hartford, 727 F. Supp. 2d at 778; see, e.g., Klass v. Twin City Fed. Sav. & Loan Ass'n, 190 N.W.2d 493, 494-95 (Minn. 1971)(holding that "[a] cause of action for unjust enrichment may be based on situations where it would be morally wrong for one party to enrich himself at the expense of another.")(internal quotation marks omitted).

The court agrees with the previous cases in this district concluding that the Minnesota Supreme Court would hold that unjust enrichment claims may be based on a moral wrong, even if not a wrongful act.

Whether MelTel's retention of the Lease Rights is a moral wrong rests on the jury's determination as to whether MelTel was a bona-fide purchaser of those rights. As a result, MelTel is not entitled summary judgment on the unjust enrichment claim.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that: the motions for judgment on the pleadings, or, in the alternative, summary judgment, [ECF Nos. 57 and 58] are denied.

Dated: March 29, 2019

                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court